UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------X
EDWARD CONNOLLY, et al.,

        Plaintiffs,

  -against-

**MEMORANDUM & ORDER**
14–CV–2121 (JMA) (AKT)

CHEMTREAT, INC, et al.,

        Defendants.
-------------------------------------------------------------X

FILED
CLERK
1/11/2016 3:51 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES:**

Glen S. Faber
Faber & Troy
180 Froehlich Farm Blvd
Woodbury, NY 11797
    *Attorney for Plaintiff*

William A. Ruskin
Gordon & Rees, LLP
One Battery Park Place
28th floor
New York, NY 10004
    *Attorney for Defendant*

**AZRACK, United States District Judge:**

    Defendant ChemTreat, Inc. ("ChemTreat") has moved for summary judgment on plaintiff Edward Connolly's negligence claim. Defendant argues, *inter alia*, that plaintiff cannot establish a *prima facie* case of negligence because the undisputed evidence shows that defendant did not owe a duty of care to plaintiff. For the reasons stated below, defendant's motion for summary judgment is granted.

1

I. Background

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements, the declarations and exhibits referenced therein, and any additional statements of material facts provided in the parties' briefings.[1] These facts are undisputed unless otherwise noted.

**A. The Parties**

Covanta is a waste-to-energy producer that converts hundreds of tons of household waste into energy each day through burning waste to generate electricity. Connolly was employed by Covanta at its plant in Hempstead, Long Island (the "Covanta Facility") from 1990 until 2011. Connolly's responsibilities at the Covanta Facility included supervising the removal of the "drift and fill." The drift and fill are components of a water cooling tower utilized by Covanta in the waste-to-energy conversion process.[2] The drift and fill are susceptible to fouling from dirt, debris, or biologic growth (such as algae or fungus).

ChemTreat develops chemical treatment programs for industrial facilities and sells chemicals designed to prevent corrosion, scale, and biofouling in critical heat transfer systems, such as those used at the Covanta Facility. (Def.'s 56.1 ¶ 15.) In 2006, Covanta retained ChemTreat to provide services and chemicals to the Covanta Facility. (Def.'s 56.1 ¶ 10; Affidavit

---

[1] In opposing defendant's motion for summary judgment, plaintiff submitted a Response to Defendants' Statement of Material Facts (ECF No. 59-22) that failed to cite record evidence and did not comply with both Local Civil Rule 56.1 and my Individual Rule IV.D. Months after the summary judgment briefing was filed, plaintiff filed, without the Court's permission, deposition transcripts and expert reports in support of his opposition. This was improper. Also, plaintiff never attempted to file a revised 56.1 statement that included citations to these newly filed documents. In light of these errors, the Court could have decided to simply disregard plaintiff's evidence and 56.1 statement. However, it is unnecessary to determine whether such a sanction is appropriate here. The Court has considered plaintiff's 56.1 statement and has reviewed all of the belated evidence that plaintiff submitted in opposition to the motion. As explained below, none of that evidence raises material issues of fact that preclude summary judgment.

[2] In the Covanta Facility, incinerated waste creates steam that is directed to a water cooling tower. The drift eliminator (or drift) is a mechanism that prevents the unwanted release of droplets of liquid water—as opposed to steam—into the environment, which can contain pollutants. The fill is a mechanism that increases the surface-to-air ratio of water in the cooling tower.

of Kevin P. Connors ("Connors Aff.") ¶ 2, ECF No. 59-3.) Connolly was never an employee or a contractor of ChemTreat. (Def.'s 56.1 ¶ 3.)

In Spring 2010, the drift and fill at the Covanta Facility was removed. (Pl. Opp. at 3.) Connolly asserts that during this maintenance, he was exposed to black dust containing "biologic growth," which caused to him suffer hypersensitivity pneumonitis. (Id.) Connolly alleges that his illness was a result of ChemTreat's negligence, chiefly a failure in its chemical treatment process and failure to adequately perform inspections for biologic build-up. (Pl. Opp. at 15.)

### B. The Agreement

Covanta retained ChemTreat pursuant to a Facility Goods and Services Agreement (the "Agreement"). (Def.'s 56.1 ¶ 14.) The Agreement delineates the contractual relationship between ChemTreat and Covanta.

According to the Agreement, ChemTreat "will provide a complete **SERVICE-ORIENTED** water treatment program." (Declaration of William A. Ruskin ("Ruskin Decl."), Ex. B, at B-1, ECF No. 59-7 (hereinafter "Goods and Services Agreement") (emphasis in original).) ChemTreat's program "shall include the treatment of cooling tower influent, high-pressure steam generators and the turbine generator circulating water systems." (Id.) The Agreement required ChemTreat's program to include "all chemical product and professional services to minimize repair and maintenance costs associated with replacement and cleaning of equipment due to scale, corrosion, and fouling or microbiological activity." (Id.) ChemTreat must "thoroughly train Covanta personnel on the implementation and control of the program" and would "be responsive in an 'on call' consulting basis in the event of spill, exposure or release." (Id.) Under the Agreement, ChemTreat provided, *inter alia*:

"[A] comprehensive chemical testing program with written instructions and test procedures

for all control tests."

\*\*\*\*

"[P]rogram documentation which shall contain a description of the program, chemical test procedures, log sheets, product bulletins, material safety data sheets, feed and control equipment specifications, and complete handling and storage safety procedures."

\*\*\*\*

"[A] written statement of the condition of equipment for all equipment made available for internal inspection."

\*\*\*\*

"[A] yearly review of the treatment program. [ChemTreat's] representatives shall discuss at this time, meet with the designated representatives of Covanta to discuss treatment programs, equipment, program effectiveness costs and future objectives."

\*\*\*\*

"[T]raining sessions for Covanta personnel. The training shall include how to perform tests and monitor chemical program results, how to work with the chemicals safely and general training regarding the boiler and cooling systems."

(Goods and Services Agreement at B-3 – B-4.)

Article 10 of the Agreement is entitled "Safety/Health and Work Site Cleanliness." (Id. at B-5, ¶ 10.) Article 10 requires, *inter alia*, that ChemTreat:

> shall be responsible for initiating, maintaining and supervising all safety measures and programs, including the conduct of regular safety meetings with its employees and its subcontractors and their employees, and shall take all necessary measures to ensure that all such persons provide and maintain a safe working environment, properly protecting all persons on and in proximity of the Contractor's work area from risk of injury, danger to health and property from damage or loss.

(Id. at B-5, ¶ 10(a).) In addition, Article 10 states that that ChemTreat "shall have general

supervisory authority over its work area, including the power and duty to correct safety and health violations or require their correction." (Id. at B-5, ¶ 10(c).) Article 10 also provides that ChemTreat "shall not cause or permit a hazardous, unsafe, unhealthful or environmentally unsound practice, procedure, condition and/or activity to exist or be conducted at or near its work areas." (Id.). The term "work area" is not defined in the Agreement. The evidence in the record shows that ChemTreat's work area was limited to Covanta's laboratory and control room. (Def.'s 56.1 ¶ 29.) There is no evidence that ChemTreat's work area included the cooling towers. (Def.'s 56.1 ¶ 27–30, 38, 46–47.)

The Agreement does not indicate that ChemTreat was responsible for the general operations of the Covanta Facility, nor for equipment maintenance, repair, or disposal. (Def.'s 56.1 ¶ 26; see generally Goods and Services Agreement.) There is no evidence that ChemTreat performed such tasks at the Covanta Facility.

### C. Connolly's Alleged Exposure to Aspergillus

Connolly alleges that in the Spring of 2010, "he was exposed to black dust which contained biologic growth" during removal of the drift and fill at the Covanta Facility. (Pl. Opp. at 3.) Covanta hired a contractor, Zaymech, to handle the replacement of the drifts and fills. (Ruskin Decl., Ex. B, Deposition of Edward Connolly ("Connolly Dep.") Tr. 93:8-16, ECF No. 59-11.) Nothing in the Agreement indicates that ChemTreat's work included the cleaning, maintenance, or repair of the drift and fill in the cooling tower. (See generally Goods and Services Agreement.) Moreover, there is no evidence that ChemTreat played any role in the removal or disposal of the drift and fill.[3] (Def.'s 56.1 ¶ 4.)

---

[3] In plaintiff's 56.1 statement, plaintiff disputes defendant's assertion that it was not involved in the removal and disposal of the drift and fill. (Pl.'s Resp. to Def.'s 56.1 ¶ 4.) Plaintiff suggests that this fact is disputed because "ChemTreat was 'involved in' providing water treatment and chemical products, services and consulting." (Id.) Plaintiff, however, is mistaken. The fact that ChemTreat was involved in providing those products, services

In December 2010, Connolly was diagnosed with hypersensitivity pneumonitis with clinical signs of allergic bronchopulmonary aspergillosis, which he alleges was caused by his exposure to aspergillus during the removal of the drift and fill. (Pl. Opp. at 3.) Connolly did not work with any of the chemicals provided by ChemTreat and was not involved in any of the testing in the cooling tower. (Connolly Dep. Tr. 8:23-9:2.)

## II. Discussion

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

"An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286.

To defeat a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See

---

consulting, does not indicate that ChemTreat was involved in the removal and disposal of the drift and fill.

Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

**B. Negligence Claim**

ChemTreat argues that its contract with Covanta did not give rise to a duty of care to Connolly. As explained below, the Court agrees and concludes that ChemTreat is entitled to summary judgment.[4]

Under New York law, a plaintiff seeking recovery for personal injuries under a negligence theory must show duty, breach, actual and proximate causation, and damages. Williams v. Utica College of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006). Whether a duty of care exists is typically a question of law for the court. Guzman v. Wackenhut Corp., 394 F. App'x 801, 803 (2d Cir. 2010); Palka v. Servicemaster Mgmt. Serv. Corp., 83 N.Y.2d 579, 585 (N.Y. 1994) ("[The definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration."). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013) (citing Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 138 (N.Y. 2002)); see also Chahales v. Westchester Joint Water Works, 47 A.D.3d 610, 610 (N.Y. App. Div. 2d Dep't 2008) ("It is axiomatic that before a defendant may be held liable for negligence it must be shown that the defendant owes a duty to the plaintiff. In the absence of duty, there is no breach and without a breach there is no liability.").

"In analyzing questions regarding the scope of an individual actor's duty, the courts look to whether the relationship of the parties is such as to give rise to a duty of care." Di Ponzio v.

---

[4] Defendant also argues that even if a duty existed, it did not breach that duty of care and was not the cause-in-fact or the proximate cause of plaintiff's injury. Because, as explained below, the Court finds that no duty of care existed, the Court does reach the merits of defendant's breach or causation arguments.

Riordan, 89 N.Y.2d 578, 583 (N.Y. 1997). A contractor does not owe an independent tort duty of care to a non-contracting party. Guzman, 394 F. App'x at 803 (citing Espinal, 98 N.Y.2d 13 at 138–39); see also Church v. Callanan Indus., Inc., 99 N.Y.2d 104, 111 (N.Y. 2002). Connolly was not a ChemTreat employee or contractor, and ChemTreat did not own or operate the Covanta Facility. (Def.'s 56.1 ¶¶ 3, 7–8.) Accordingly, ChemTreat did not owe a general duty to keep Connolly safe from hazards arising at the Covanta premises. Thus, if ChemTreat owed Connolly any duty, it must arise from ChemTreat's contract with Covanta or other special circumstances.

There are three circumstances under which a duty of care extends to non-contracting third parties arising out of a contractual obligation:

> (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, launche[s] a force or instrument of harm, [or] negligently creates or exacerbates a dangerous condition;
>
> (2) where the plaintiff determinately relies on the continued performance of the contracting party's duties; and
>
> (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely

Espinal, 98 N.Y.2d at 140; see also Guzman, 394 F. App'x at 803.

The Court liberally construes plaintiff's papers to contend that defendant owed him a duty of care under each of these exceptions. However, for the reasons explained below, no duty for ChemTreat arises under any of the three exceptions.

### i. ChemTreat Did Not Negligently Create or Exacerbate a Dangerous Condition

ChemTreat argues that its alleged failure to inspect equipment and maintain chemical levels under its contractual obligation did not create an unreasonable risk of harm or increase a risk of harm. A duty of care arises when the contracting party, in the course of performing her contractual duties, "launche[s] a force or instrument of harm" or "negligently creates or

exacerbates a dangerous condition." Espinal, 98 N.Y.2d at 140; Doona v. OneSource Holdings, Inc., 680 F. Supp. 2d 394, 402 (E.D.N.Y.2010) ("[C]ourts have fleshed out the vagaries of this language by emphasizing that this test is met when a defendant creates or exacerbates a harmful condition."). Put another way, this exception applies "where the promisor, while engaged affirmatively in discharging a contractual obligation, creates an unreasonable risk of harm to others, or increases that risk." Church, 99 N.Y.2d at 111. However, "[a] person does not unleash a force of harm when the purpose of the contractual obligation he is undertaking is to mitigate a preexisting risk." Dillon v. U.S.A., No. 10-CV-6112T, 2012 WL 2923357, at *3 (W.D.N.Y. July 18, 2012).

In Church, the court held that no duty of care existed between the defendant, who was under a contractual duty to install a guiderail along a portion of the highway, and the plaintiff, who was injured when his car diverged from the road at a point where defendant had failed to complete installing the guiderail. Church, 99 N.Y.2d at 112. The court explained that the defendant's incomplete performance of its contractual duty did not increase "the risk which existed even before [defendant] entered into any contractual undertaking." Id. Instead, defendant merely neglected to make the highway safer—"as opposed to less safe." Id. Such a promisor "is immune from liability because the breach of contract consists merely in withholding a benefit where inaction is at most a refusal to become an instrument for good." Id. (citing Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 167–68 (1928)); see also All Am. Moving & Storage, Inc. v. Andrews, 96 A.D.3d 674, 675 (N.Y. App. Div. 1st Dep't 2012) (holding that defendant's failure to inspect sprinkler system did not launch a force or instrument of harm when sprinkler system malfunctioned during warehouse fire).

Here, plaintiff's negligence claim is based on defendant's alleged omission, *i.e.*, that

"Plaintiff's exposure to the black dust was a result of the failure of ChemTreat treatment process." (Pl. Opp. at 15.) Even if ChemTreat negligently performed its contractual obligations because of a flawed testing process and failure to inspect the drift and fill, these actions (or omissions) merely neglected to make the drift and fill safer. Plaintiff has not presented any evidence of an affirmative act by ChemTreat that launched an instrument of harm. In the course of discharging its contractual obligation to create a comprehensive water treatment program, ChemTreat did not increase "the risk which existed even before [defendant] entered into any contractual undertaking." See Church, 99 N.Y.2d at 112. Because the Court finds that ChemTreat did not "create[] or exacerbate[] a dangerous condition," the "instrument of harm" exception to liability based on a third-party contract does not apply here. See Espinal, 98 N.Y.2d at 140.

### ii. Connolly Did Not Detrimentally Rely on ChemTreat's Continued Performance of Contractual Duties

ChemTreat argues that plaintiff did not detrimentally rely on ChemTreat's continued performance of its duties when Connolly participated in the removal of the drift and fill. A duty of care arises when a plaintiff detrimentally relies on a contract to which she is a third party. Espinal, 98 N.Y.2d at 140 ("[T]ort liability may arise where performance of contractual obligations has induced detrimental reliance on continued performance and the defendant's failure to perform those obligations positively or actively works an injury upon the plaintiff."). "To establish detrimental reliance on promises contained in a [third-party] contract, a plaintiff must demonstrate that he or she had knowledge of the contractual obligations on which he or she allegedly relied." Dillon, 2012 WL 2923357, at *3.

ChemTreat contends that Plaintiff has offered no evidence that, prior to his alleged injuries, he detrimentally relied on the continued performance of ChemTreat's contractual duties while performing his job generally or cleaning and removing the drift and fill specifically. The Court

agrees. Therefore, the "detrimental reliance" exception to liability based on a third-party contract does not apply here.

### iii. Under the Agreement, ChemTreat Did Not Comprehensively and Exclusively Assume Covanta's Duties to Safely Maintain the Covanta Facility

ChemTreat argues that it did not completely displace Covanta's responsibilities for safely maintaining the Covanta Facility. A party to a contract assumes a duty of care to a third party when, pursuant to the contractual agreement, the promisor fully assumes the promisee's responsibilities to safely maintain the premises. Espinal, 98 N.Y.2d at 140 ("[A] party who enters into a contract to render services may be said to have assumed a duty of care—and thus be potentially liable in tort—to third persons . . . where . . . the contracting party has entirely displaced the other party's duty to maintain the premises safely."); Gonzalez v. Aramark Food & Support Servs. Grp. Inc., No. 09-CV-4843 CBA, 2012 WL 1019982, at *6 (E.D.N.Y. Mar. 26, 2012) ("[A] duty exists when, as a result of a contract, one party fully assumes the other's responsibilities in a specific, articulable sphere to a reasonably predictable, identifiable class of individuals."). The contract must be "comprehensive and exclusive" in displacing certain responsibilities from one contracting party to another. Church, 99 N.Y.2d at 113.

Plaintiff raises two arguments in an attempt to invoke this exception. First, plaintiff contends that the Agreement here is analogous to the contract in Palka v. Servicemaster Mgmt. Serv. Corp.. Second, plaintiff suggests that the safety provisions in the Agreement trigger this exception. Both of these arguments are flawed.

First, the contract in Palka and the contract in this case are starkly different in the scope of responsibility the contracting party assumed to safely maintain the premises. In Palka, the court held that a duty of care existed between a contracting party, responsible for providing maintenance to a hospital, and a third party injured by a negligently mounted wall fan. 83 N.Y.2d at 585. The

11

contract in Palka required defendant "to train, manage, supervise and direct all support services employed in the performance of daily maintenance duties." Id. at 584. The court found that the contract served as an "extensive privatization arrangement [that] displaced entirely the hospital's prior in-house maintenance program and substituted an exclusive responsibility in [defendant] to perform all of [the] Hospital's pertinent nonmedical, preventative, safety inspection and repair service functions." Id.

The Agreement here is easily distinguishable from the contract in Palka. In a broad sense, the Agreement is nothing like the comprehensive and exclusive maintenance contract in Palka. In Palka, the contract explicitly provided that the contractor was responsible for directing the hospital's maintenance department. Id. at 584. The contractor was required to "train, manage, surprise and direct" all maintenance employees, "perform all administrative duties" relating to maintenance, "pay all direct operating costs and expenses required in the performance" of maintenance services, and "provide and maintain the daily work and project schedules, standard operating procedures and training manuals" relating to maintenance services. Id. at 583. This included "preventative maintenance and casualty control or casualty prevention" and "inspection and checking to see if something needs repairing before it falls." Id. at 584. It was the contractor's "responsibility to instruct [the hospital's] maintenance department employees on how and when to perform maintenance on all electrical and mechanical equipment," including the wall mounted fan that caused the injury. Id.

Here, the Agreement called for ChemTreat to provide a "complete service-oriented water treatment program." (Goods and Services Agreement at B-1.) ChemTreat's responsibilities were confined to providing chemical products and professional services "to minimize repair and maintenance costs associated with replacement and cleaning of equipment due to scale, corrosion,

12

and fouling or microbiological activity." (Id.) The safety provisions in the Agreement were ancillary to ChemTreat's effectuating a chemical treatment program. Covanta retained the remaining responsibility to safely maintain the water cooling tower, in particular with respect to the operation, equipment maintenance, and equipment repair and disposal. (Def.'s 56.1 ¶ 26.)

Unlike the contract in Palka, the Agreement here did not call on ChemTreat to broadly manage or supervise Covanta employees in the performance of their responsibilities. With respect to interactions with Covanta personnel, ChemTreat's responsibilities were discrete and circumscribed. ChemTreat was merely responsible for training Covanta employees on implementing and operating the water treatment program, as well as responding on an "on call" basis in the event of a spill, exposure, or release of chemicals stemming from the water treatment program. (Id.) Additionally, in Palka, the contract called for defendant to provide "preventative maintenance and casualty control or casualty prevention" by conducting inspections to determine "if something needs repairing before it fails." 83 N.Y.2d at 584. In contrast, ChemTreat was not responsible for cleaning, maintaining, disposing, or repairing equipment, adding chemicals, or inspecting equipment apart from when requested or made available by Covanta. (Def.'s 56.1 ¶¶ 26, 36–47; see generally Goods and Services Agreement.) Under the Agreement, ChemTreat was responsible for conducting discrete tasks in discrete work areas.

Second, contrary to Connolly's suggestion, none of the health and safety provisions in Article 10 of the Agreement give rise to a duty. Article 10 of the Agreement states the following:

"[ChemTreat] shall be responsible for initiating, maintaining and supervising <u>all safety measures and programs</u>, including the conduct of regular safety meetings with its employees and its subcontractors and their employees, and shall take all necessary measures to ensure that all such persons provide and maintain a safe working environment, properly protecting all persons <u>on and</u>

in proximity of the Contractor's work area from risk of injury, danger to health and property from damage or loss." (Goods and Services Agreement at B-5, ¶ 10(a).)

\*\*\*\*

"[ChemTreat] shall have general supervisory authority over its work area, including the power and duty to correct safety and health violations or require their correction." (Id. at B-5, ¶ 10(c).)

\*\*\*\*

"[ChemTreat] shall not cause or permit a hazardous, unsafe, unhealthful or environmentally unsound practice, procedure, condition and/or activity to exist or be conducted at or near its work areas."

(Id.) (emphasis added).

Most of the relevant provisions above concern ChemTreat's health and safety obligations in and around ChemTreat's work areas. Plaintiff suggests that a duty exists here because ChemTreat's work area included the cooling tower. (Pl.'s Mem. at 12.) However, nothing in the Agreement or the factual record indicates that ChemTreat's work areas included the cooling tower.[5] (See generally Goods and Services Agreement.) Moreover, the evidence in the record shows that ChemTreat did not perform work in or around the cooling tower. (Def.'s 56.1 ¶ 27–30, 38, 46–47.) In his opposition brief, plaintiff asserts that "there is no dispute that ChemTreat's work did extend to the cooling tower at issue." (Id.) Plaintiff, however, does not point to any evidence to support that proposition, and the Court finds none in the record. Accordingly, no duty can possibly arise from these provisions.[6]

---

[5] Although the term "work area" is not defined in the Agreement, even a broad interpretation of the term "work area" does not suggest that ChemTreat's work area included the cooling tower.

[6] The only health and safety provision that is not explicitly limited to ChemTreat's work areas (or ChemTreat's own

14

Based on the record, ChemTreat did not "entirely absorb" the duty to maintain safe conditions for the entire Covanta Facility, or even for the cooling tower. See Espinal, 98 N.Y.2d at 140. Therefore, the "comprehensive and exclusive" exception to liability based on a third-party contract does not apply here.

### III. Conclusion

Because there was no duty in tort running from ChemTreat to Connolly, Plaintiff fails to present a *prima facie* case for negligence under New York law. Therefore, ChemTreat is entitled to summary judgment. The negligence claim against ChemTreat is dismissed.

For the reasons set forth above, Defendant's motion for summary judgment is granted.

---

employees and subcontractors) is the first clause of the following provision in Article 10:

> [ChemTreat] shall be responsible for initiating, maintaining and supervising all safety measures and programs, including the conduct of regular safety meetings with its employees and its subcontractors and their employees, and shall take all necessary measures to ensure that all such persons provide and maintain a safe working environment, properly protecting all persons on and in proximity of the Contractor's work area from risk of injury, danger to health and property from damage or loss.

(Goods and Services Agreement at B-5, ¶ 10(a).))

Plaintiff, however, does not raise any explicit arguments about the interpretation of this clause. Moreover, when viewed in light of the language and examples that follow this clause and the Agreement's other provisions, this clause cannot be read to mean that ChemTreat comprehensively and exclusively displaced Covanta's safety responsibilities throughout Covanta's Facility. Moreover, the Court doubts that the allegedly negligent acts of ChemTreat at issue in this suit are the type of "safety measures and programs" this boilerplate contract language was intended to address.

**SO ORDERED.**

Date: January 11, 2016
Central Islip, New York

                                                  _____/s/ (JMA)_____
                                                  Joan M. Azrack
                                                  United States District Judge